THOMAS, Judge.
Lori Childers (“the mother”) and Chad Brewer (“the father”) were divorced by a judgment entered by the Lawrence Circuit Court in 2007. There is one child of the marriage (“the child”), who was born in 2003. The mother has one other child (“the half sister”) with a different father. By incorporating the parties’ mediation agreement into the divorce judgment, the circuit court had awarded the parties joint “care, custody, and control” of the child but had awarded the mother primary physical custody.[1] The divorce judgment also included a paragraph entitled “Education, health[,] and welfare of the child” (“the education clause”), which provided in pertinent part: “All questions pertaining to the education, health, summer activities!,] and welfare of [the child] shall be decided by [the father] and [the mother] jointly and each shall consult the other as often as it may be necessary regarding all such matters.” Despite the provisions of the divorce judgment, for a period of years the parties exercised true joint custody. The mother resided in Moulton, the father resided seven miles outside Moulton, and the child attended Moulton Elementary School. By a letter dated February 27, 2013, the mother informed the father that, on May 24, 2013, she intended to relocate the child to Hartselle and that the child would attend Cotaco School in Somerville.
On March 26, 2013, the father filed petitions objecting to the relocation of the child and seeking to prevent the mother from relocating the child. The father requested an order awarding him custody of the child, ordering the mother to pay child support, and awarding the mother visitation. On March 28, 2013, the mother filed a response in opposition to the father’s petitions, asserting that she was the physical custodian of the child and that certain provisions of the Alabama Parent-Child Relationship Protection Act (“the Act”), codified at § 30-3-160 et seq., Ala.Code 1975, did not apply because her relocation was within Alabama and was only 41 miles from the father’s residence.[2] Thus, the *213 mother asserted, she was entitled to relocate the child as long as she kept the father apprised of certain relocation information. On April 27, 2013, the mother married Ashley Kip Childers (“Kip”), and she subsequently relocated the child to Hartselle.
On August 6, 2013, the father filed a second petition seeking a custody modification in which he asserted that the child had attended, and had received individualized attention at, Moulton Elementary School since kindergarten. The father argued that the mother’s marriage and the child’s relocation that resulted in a change of schools represented material changes in circumstances and that a transfer of the child’s primary physical custody to the father was in the child’s best interest. Furthermore, the father alleged that the child had been left alone with Kip’s nephew (“the nephew”) “in recent weeks.” According to the father, there was an indication that, in the past, the nephew had been accused of sexual abuse of Kip’s then 3-year-old son (“the stepson”). The father requested an award of primary physical custody of the child and an order requiring the child to remain enrolled in Moulton Elementary School. The father included unverified letters from the Moulton Elementary School principal and its counselor indicating that it would be detrimental to the child to change schools.[3]
A trial was held on September 24, 2013, at which the circuit court heard ore tenus testimony. At that time the child was enrolled in Cotaco School. On May 19, 2014, the circuit court entered a judgment in which it awarded the father primary physical custody of the child, awarded the mother specific visitation with the child, terminated the father’s child-support obligation, ordered the mother to pay the father $215.30 per month in child support, and denied all other relief requested. On May 28, 2014, the mother filed a motion to alter, amend, or vacate the modification judgment, and she requested a hearing. On July 29, 2014, the mother filed a motion asserting that the child desired to testify and requested a hearing to receive the child’s testimony, to which the father filed an objection. The circuit court denied the mother’s request, but permitted the mother to submit an affidavit including a proffer of the child’s intended testimony; no such affidavit appears'in the record. The mother’s postjudgment motion was denied by operation of law on August 26, 2014.
On October 3, 2014, the mother filed a timely notice of appeal seeking this court’s review of five issues — whether the circuit court erred by failing to require the father to meet the custody-modification burden set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984), by failing to properly apply the provisions of the Act, by failing to properly interpret the education clause, by awarding the mother standard visitation, and by failing to subtract the cost of the child’s health-care insurance that was paid by Kip.
“It is well settled that when a trial court receives ore tenus evidence in a child-custody-modification proceeding and bases its judgment on its findings of fact, that judgment will not be reversed absent an abuse of discretion or a showing that the findings are plainly and palpably wrong. West v. Rambo, 786 So.2d 1138 (Ala.Civ.App.2000); E.M.C. *214 v. K.C.Y., 735 So.2d 1225 (Ala.Civ.App.1999). A judgment based on ore tenus evidence is presumed correct and will be affirmed if supported by competent evidence. N.G. v. L.A., 790 So.2d 262 (Ala.Civ.App.2001).”
Smith v. Smith, 865 So.2d 1207, 1209 (Ala.Civ.App.2003).
The father testified that, before the mother relocated the child, the parties’ relationship was “as good as it could be.” He said that the parties had easily cooperated and that they, along with members of the paternal family, had, for example, eaten dinner together to celebrate the child’s birthday. He said that he had never failed to meet his child-support obligation. At the time of the trial the child resided with the mother in Hartselle in a three-bedroom trailer on Kip’s family’s property; the child shared a bedroom with the half sister. The mother said that Kip would someday inherit the property and that they planned to build a house in the future. The father testified that he lived in a two-bedroom trailer and that, although the child had her own room at his residence, she slept in the same bed in which he slept. The mother said that the child had never slept in the same bed with her. The mother agreed that the father was a good father, and the father agreed that the mother was a good person, but, according to the father, there was no positive reason for the relocation.
The child was enrolled as a fourth-grade student at Cotaco School, which was located eight miles from the mother’s residence. The father testified that he desired that the child return to Moulton Elementary School because that was where the child’s family was known and where a “special program” had been developed to help the child with her reading skills. Paige Terry, the principal of Moulton Elementary School, testified that the child had been diagnosed with a learning disability that had affected her reading ability and that an individualized educational plan (“IEP”) had been developed and implemented for the child at Moulton Elementary School. Terry said that Cotaco School also had a copy of the child’s IEP and that its staff also had the ability to implement the child’s IEP. The mother testified that Cotaco School had implemented the child’s IEP, that the child had made friends, and that the child wished to remain at Cotaco School. Don Murphy, the retired superintendent of education of Morgan County, testified that Cotaco School was “very good” and that the school’s test scores were “always good,” “in the top,” or “considerably above average.” He said that a specific state evaluation of which he was aware had indicated that Moulton Elementary School had not performed at a proficient level in the area of special education.[4] Terry denied that Moulton Elementary School had performed at a less than proficient level in any area. Terry said that the child had a “strong support system” at Moulton Elementary School and that the parties had been beneficially involved in the child’s education in the past.
The father testified that, after the child relocated, the child’s relationships with him and with other relatives had changed because she did not spend the same amount of time with them as she had in the past. The father testified that many of the child’s relatives, including both sets of grandparents, resided within a seven-mile radius of Moulton. The father testified that, before the mother had relocated the child, the child had enjoyed daily interaction with her paternal grandparents and two sets of paternal aunts and uncles at school and at the paternal grandfather’s *215 business that was located one block from the school.[5] According to the father, he had incurred $600 per month in additional gasoline expenses for traveling to pick up the child for his visitation periods and that the child was burdened by “that long of a trip.” The mother, who was unemployed, testified that she had refused to meet the father at a halfway point because, she said, if she had a job, doing so would be impossible.
The mother admitted that the nephew had been accused of sexually abusing the stepson, but that the nephew had not been prosecuted, and that she was comfortable with the presence of the nephew. Steve Shadden, the stepson’s maternal grandfather, testified that the stepson had been sexually abused when he was three years old.[6] Shadden said that he and several other family members had taken the stepson to a children’s clinic upon his return from a visit with Kip because they had observed a severe rash and swelling of the child’s rectum. Although Shadden admitted that there was a dispute regarding who had sexually abused the stepson, Shadden said that he had observed that the stepson was “scared to death” of the nephew. Kip testified that the alleged sexual abuse had not happened. Kip intimated that the stepson’s maternal family had made a false allegation when he and the stepson’s mother were in the midst of a divorce; Kip said: “[A]nd we all know why it’s brought up now.”[7] Kip said that the stepson still saw the nephew at family occasions and that the stepson was not afraid of the nephew. When asked if the nephew would visit the house when the child was present, Kip said: “Yeah, he could come. I don’t have any problem with him. Never had any problem with him after I got all the facts and, you know, [the Department of Human Resources] ... said there wasn’t enough evidence.”
First, the mother argues that the circuit court erred by failing to require the father to meet the custody-modification burden set forth in Ex parte McLendon.
“When a noncustodial parent petitions for a custody modification, that parent bears the burden of proving the stringent standard set out by our supreme court in Ex parte McLendon, 455 So.2d 863 (Ala.1984). That standard applies, as here, when the parents share joint legal custody but there is a previous judicial determination placing primary physical custody with one parent. Jenkins v. Jenkins, 541 So.2d 19 (Ala.Civ.App.1989). The petitioner must prove initially that a material change in circumstances has occurred since the last decree and that a change in custody would promote the child’s welfare and best interests. Further, the benefits of the proposed change must clearly outweigh the inherently disruptive effect caused by uprooting the child. Jenkins, supra, and McLendon, supra.”
Crane v. Crane, 563 So.2d 615, 617 (Ala.Civ.App.1990).
The father provided evidence demonstrating material changes of circumstances — the mother had remarried and the mother had relocated the child to a *216 new residence and a new school. The father also provided evidence indicating that the child was not able to spend as much time with the father and her extended family, that the child was required to travel over an hour each way to visit the father, and that the mother had allowed the child to be exposed to an alleged perpetrator of sexual abuse of a child. The modification judgment expressly provides that the circuit court based the change of custody on “restoring” the child to the life and circumstances she knew, to mitigate instability, and to restore her well-being, and, in its judgment, the circuit court noted that the father had “raised issues regarding the home life of [Kip] related to certain allegations regarding [the stepson].” We conclude that the circuit court could have reasonably determined that the father had satisfied his burden under McLendon,[8] Thus, the mother has failed to demonstrate reversible error regarding her first issue.
Second, the mother argues that the circuit court erred by failing to properly apply the provisions of the Act. The mother is correct that she, as the custodial parent, was entitled to relocate the child and that, due to the distance from the father’s residence to the child’s new residence, certain provisions of the Act did not apply. See note 2, supra. The mother contends that the circuit court shifted the burden of proof to her. To be sure, the circuit court’s modification judgment includes unnecessarily harsh comments regarding the mother’s decision to remarry and to relocate the child; however, we conclude that the circuit court neither required the mother to comply with all the provisions of the Act nor shifted the burden of proof to the mother. It expressly concluded that the burden imposed by the McLendon standard was upon the father.
Third, the mother argues that the circuit court erred by failing to properly interpret the education clause. The circuit court’s modification judgment concluded that the mother had violated the education clause by her unilateral decision to change the child’s school. Again, the mother argues that that conclusion necessarily evinces the circuit court’s shift of the burden of proof to her, and, again, we do not agree. Furthermore, even if we agreed that the mother, as the custodial parent, was entitled to enroll the child in a different school without the father’s consent, such agreement would not alter our earlier conclusion that the father had met the custody-modification burden set forth in Ex parte McLen-don.
Fourth, the mother argues that the circuit court erred by awarding the mother “inadequate” standard visitation. The circuit court awarded the mother visitation with the child on the first, third, and fifth weekends of each month, three weeks in June, and two weeks in July. The circuit court specifically addressed Christmas, Mother’s Day, Father’s Day, the parties’ birthdays, and the child’s birthday. The mother contends that the circuit court failed to allow visitation on six other holidays, although she concedes in a footnote that the circuit court did in fact provide that all holidays not specifically addressed would be split from 8:30 a.m. until 2:00 *217 p.m. and from 2:00 p.m. until 8:30 p.m.[9] Although we agree that the provision is not optimal, we conclude that the award of liberal summer visitation to the mother and the inclusion of a provision allowing the parents to agree to visitation times offsets the potential negative effects of the unusual holiday-visitation award. “The trial court has broad discretion in determining the visitation rights of a noncustodial parent, and its decision in this regard will not be reversed absent an abuse of discretion.” Carr v. Broyles, 652 So.2d 299, 303 (Ala.Civ.App.1994).
Finally, the mother argues that the circuit court erred by failing to subtract the cost of the child’s health-care insurance on the CS — 42 child-support form. At the time the circuit court entered its judgment, Rule 32(B)(7)(e), Ala. R. Jud. Admin., provided: “The amount to be added to the ‘basic child-support obligation’ shall be the actual amount of the total insurance premium for family/dependent coverage, regardless of whether all children covered are in the same family.” The terms of the divorce judgment had required the mother to provide the child’s health-care insurance, and the mother testified that Kip’s employer had added the child to Kip’s family health-insurance coverage when she married him.[10] According to the mother, the actual amount of the total insurance premium is $414. The circuit court gave the mother no credit for the actual amount of the total insurance premium; thus, we agree with the mother that the circuit court erred, although the mother had testified that no additional cost was incurred to add the child to Kip’s insurance plan. See Fuller v. Fuller, 93 So.3d 961, 970 (Ala.Civ.App.2012) (explaining that the language of Rule 32(B)(7)(e) specifically acknowledged that family or dependent coverage could include children who are not the subject of the child-support obligation but still required “that the ‘actual amount of the total insurance premium’ be used in the child-support-obligation calculation”); see also Bertram v. Doss, 709 So.2d 1274 (Ala.Civ.App.1998); Brown v. Brown, 719 So.2d 228 (Ala.Civ. App.1998). Therefore, the judgment of the circuit court is reversed insofar as the circuit court failed to subtract the cost of the child’s health-care insurance on the CS-42 child-support form, and the cause is remanded for a recalculation of the mother’s child-support obligation or for an explanation indicating why the circuit court deviated from the child-support guidelines.[11]
*218 In conclusion, the mother has not demonstrated that the circuit court erred to reversal by failing to require the father to meet the custody-modification burden set forth in Ex parte McLendon, by failing to properly apply the provisions of the Act, by failing to properly interpret the education clause, or by awarding the mother inadequate visitation. We reverse the judgment and remand the cause insofar as the circuit court failed to subtract the cost of the child’s health-care insurance in determining the mother’s child-support obligation or failed to provide an explanation indicating why it had deviated from the child-support guidelines.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, MOORE, and DONALDSON, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. Because the mother had been awarded physical custody of the child, she was the custodial parent. See Hays v. Elmore, 585 So.2d 40, 42 (Ala.Civ.App.1990).

. Section 30-3-162(b), Ala.Code 1975, provides:
“Sections 30-3-169.1 to 30-3-169.7, inclusive, shall not apply to a change of principal residence of a child to a residence which is 60 miles or less from the residence of a non-relocating parent who is entitled to custody of or visitation with the child or if the change or proposed change results in the child residing nearer to the non-relocat *213 ing parent than before the change or proposed change, unless such change in the principal residence of a child results in the child living in a different state.”

. The father sought and received permission to re-enroll the child in Moulton Elementary School if he were awarded custody of the child despite the fact that neither he nor the mother resided in Moulton.

. There was no indication that the child required special education.

. The father was employed by the child’s paternal grandfather.

. Shadden’s daughter, Kip’s ex-wife, is the stepson’s mother. The father was dating Kip's ex-wife at the time of the modification hearing.

.Kip’s divorce judgment was offered into evidence. It includes a paragraph indicating that the parties had entered into a written agreement, which was "to be kept private.” Kip acknowledged that that written agreement was his agreement to not allow the stepson to be alone with the nephew.

. The mother alludes to an issue regarding the separation of siblings, but she fails develop the argument or cite any authority relevant to that issue; accordingly, we will not address that issue. See White Sands Grp., L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008). (“Rule 28(a)(10)[, Ala. R.App. P.,] requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party's position. If they do not, the arguments are waived.”).

. The mother has not raised an issue regarding where the child should be after 8:30 p.m. The modification judgment reads: “Parents will split all other holiday [(sic)] from 8:30 a.m. until 2:00 p.m. and 2:00 p.m. until 8:30 p.m.”

. In Jackson v. Jackson, 777 So.2d 155, 159 (Ala.Civ.App.2000), this court observed that the circuit court in that case had erred by failing to allow the proper deduction for health-insurance premiums for insurance that was provided by the child’s stepmother. Thus, the fact that, in the present case, the child's insurance is paid by Kip would not exclude that amount from consideration in calculating the mother’s child-support obligation.

.We note that, effective April 1, 2015, Rule 32(B)(7)(e), as amended by our supreme court, now provides:
"The amount to be added to the ‘basic child-support obligation' and inserted in Line 6 ('Health-Insurance Costs’) of the Child-Support Guidelines form (Form CS-42) shall be the pro rata portion of the medical-insurance premium attributable to the child or children who are the subject of the support order, which shall be calculated by dividing the total medical-insurance premium actually paid by, or on behalf of, the parent ordered to provide the coverage by the total number of persons (adult and/or children) covered and then multiplying the result by the number of children who are the subject of the support order.”